**FILED**

JAMES J. VILT, JR. - CLERK

OCT - 1 2024

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | 3:22-cr-85-CRS |
| | ) | | |
| | ) | | 18 U.S.C. § 242 |
| | ) | | 18 U.S.C. § 371 |
| JOSHUA JAYNES and KYLE MEANY, | ) | | 18 U.S.C. § 1001 |
| | ) | | 18 U.S.C. § 1519 |
| Defendants. | ) | | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### Introduction

At times material to this Indictment:

1.    Breonna Taylor (Taylor) was a 26-year-old woman who worked as an emergency room technician.  As of March 2020, she had lived for several years at 3003 Springfield Drive, Apartment 4, in Louisville, Kentucky.

2.    K.W. was a 27-year-old man from Louisville, Kentucky, who had a personal relationship with Taylor and, as of March 12, 2020, had been staying in her apartment for several days.

3.    The Louisville Metro Police Department (LMPD) in late 2019 formed a unit called Place-Based Investigations (PBI).  In early 2020, PBI was investigating alleged narcotics trafficking that was centered in the West End area of Louisville, approximately 10 miles away from Taylor's home.

1

4.     **KYLE MEANY** was an LMPD sergeant who supervised the PBI unit who, as of early 2020, had worked at LMPD for approximately 7 years.

5.     **JOSHUA JAYNES** was a detective in the PBI unit who, as of early 2020, had worked at LMPD for approximately 15 years.

6.     K.G. was a detective in the PBI unit who, as of early 2020, had worked at LMPD for approximately 8 years.

7.     On March 12, 2020, PBI, using affidavits sworn by **JOSHUA JAYNES** and approved by **KYLE MEANY**, obtained warrants to search five properties. These included four properties in Louisville's West End neighborhood that were allegedly used in drug trafficking: three properties on Elliott Avenue and one nearby property on Muhammad Ali Boulevard (the Elliott Avenue warrants). The fifth warrant was for Taylor's home at 3003 Springfield Drive, Apartment 4, approximately 10 miles away. The primary target of the investigation was J.G., a man who had been previously arrested for committing drug offenses and who had previously had a personal relationship with Taylor.

8.     LMPD's SWAT unit was assigned to execute the four warrants near Elliott Avenue, with assistance from PBI detectives and Criminal Interdiction Division (CID) officers. SWAT had no involvement in executing the warrant at Taylor's home. Instead, the warrant at Taylor's home was executed by seven non-SWAT officers assigned by **KYLE MEANY**. On the evening of March 12, 2020, the SWAT unit held a briefing to discuss its plan for executing the Elliott Avenue warrants, while PBI held a separate briefing, in a different location. The PBI briefing was for the non-SWAT officers who **KYLE MEANY** assigned to help support SWAT on Elliott Avenue and the officers **KYLE MEANY** assigned to execute the warrant at Taylor's home. **JOSHUA**

**JAYNES** and **KYLE MEANY** did not tell the SWAT unit that they were planning to execute a warrant at Taylor's home at the same time SWAT executed the Elliott Avenue warrants.

The Defendants Knew the Springfield Drive Warrant Affidavit Lacked Probable Cause

9.      **JOSHUA JAYNES** and **KYLE MEANY** knew that the affidavit they used to obtain the warrant to search Taylor's home contained information that was false, misleading, and out-of-date; that the affidavit omitted material information; and that the officers lacked probable cause for the search.

10.      For example, on March 12, 2020, **JOSHUA JAYNES** falsely claimed in the affidavit for the warrant at Taylor's home that he "verified through a US Postal inspector that [J.G.] has been receiving packages" at Taylor's home.  In fact, Postal Inspectors had relayed the opposite message: that there was no record of J.G. receiving packages at Taylor's address.

11.      Additionally, the affidavit falsely claimed that **JOSHUA JAYNES** had "observed" J.G.'s car make "frequent trips" between Taylor's home and the Elliott Avenue properties that J.G. allegedly used for drug trafficking.  In fact, **JOSHUA JAYNES** and **KYLE MEANY** had only seen J.G.'s car at Taylor's home on one occasion, on January 16, 2020, nearly two months before they submitted the warrant affidavit to a judge.

12.      The affidavit also failed to disclose, among other information, that **JOSHUA JAYNES** and **KYLE MEANY** were not aware of J.G. making any trips to Taylor's home during the six weeks preceding the March 12 warrant affidavit.

13.      The Jefferson County Circuit Court Judge who reviewed the affidavit and signed the warrant for Taylor's home was not aware at the time she approved the warrant that the affidavit contained false and misleading statements or that it omitted material information.  If the Judge had

been aware that key statements in the affidavit were false and misleading, she would not have approved the warrant for Taylor's home and there would have been no search at Taylor's home.

### The Defendants Planned to Execute the Warrant in a Manner that Heightened the Risk of Gunfire

14.     **JOSHUA JAYNES** and **KYLE MEANY** planned for officers to execute the warrant at Taylor's home late at night, simultaneously with SWAT executing the Elliott Avenue warrants, when they knew officers would brandish weapons to execute the warrant and when it was more likely that officers would surprise the unsuspecting occupants who were sleeping inside Taylor's home.

15.     Since before 2020, Kentucky has had a "stand your ground" law that allowed individuals to fire weapons in self-defense, without a duty to retreat, if they reasonably perceived a risk of great bodily harm or a felony involving use of force.  KY. REV. STAT. ANN. § 503.050(2).

16.     Additionally, at the time **KYLE MEANY** approved and **JOSHUA JAYNES** swore out the affidavit for the warrant to search Taylor's home, **KYLE MEANY** had specific information that the car of a man who had a concealed weapon permit and a documented lengthy relationship with Taylor had been at her home the previous day—and failed to provide this information to the officers they sent to execute the warrant.

17.     On the afternoon of March 11, 2020—the day before the affidavit for the warrant to search Taylor's home was sworn out—**KYLE MEANY** conducted surveillance at Taylor's home to look for information that was relevant to include in the affidavit for the warrant to search Taylor's home and information about the scene that was relevant to officer safety and should be shared with the officers who would execute the warrant the next day.  While conducting surveillance at Taylor's home for those purposes, **KYLE MEANY** and a second officer saw K.W.'s car parked in front of

4

Taylor's apartment and requested a background "workup" on K.W.  **KYLE MEANY** received and

reviewed the "workup," the first page of which stated in red, bolded, all capital letters that K.W.

had an "Active CCDW," or "concealed carry deadly weapon" permit.  The workup also included a

photograph of K.W. and Taylor from December 2017 that showed K.W. and Taylor hugging and

stated that, in 2019, K.W. and Taylor had shared the Springfield Drive address at which Taylor

resided.  Shortly after receiving this information that the car of a man with an active CCDW who

had a prior romantic relationship with Taylor was present at Taylor's home, **KYLE MEANY** called

**JOSHUA JAYNES** and talked for approximately three minutes.  However, no information about

K.W. or the presence of his vehicle at Taylor's home was included in the warrant affidavit for

Taylor's home that **JOSHUA JAYNES** drafted and **KYLE MEANY** approved.  Nor was any

information about K.W. or his vehicle communicated to the officers who executed the warrant.

18.     The next day, March 12, 2020, **KYLE MEANY** oversaw a briefing for the LMPD

officers who **KYLE MEANY** had assigned to execute the warrant at Taylor's home.  At that

briefing, **KYLE MEANY** stood by quietly as PBI detectives whom he supervised told the officers

executing the warrant at Taylor's home that officers should expect to encounter only an unarmed

young woman who would be alone in the apartment.  The executing officers were told that the

woman (Taylor) was a "soft target" because she was not suspected of committing any crimes

herself, and that the executing officers should search her home for documents and other evidence

of J.G.'s drug trafficking.  At the time, **KYLE MEANY** knew that a car belonging to a man with

an active CCDW who had a prior relationship with Taylor had been at Taylor's home the previous

day (the last time any officer had been at Taylor's home before the night of the warrant execution).

**KYLE MEANY** did not disclose this critical officer-safety information to the officers who were

preparing to execute the warrant that night, and he did not describe K.W.'s car to them so they could determine if K.W. was likely at the residence when they executed the warrant.

19.     Additionally, on March 12, 2020, **KYLE MEANY** assigned a PBI detective to conduct surveillance on Taylor's home for several hours before the officers executing the warrant arrived and to report any developments that might impact officer safety. **KYLE MEANY** did not advise the detective that he had seen the car belonging to K.W., who had an active CCDW and a prior relationship with Taylor, at Taylor's home the previous day—and he did not tell the detective to watch for whether K.W. might still be present at Taylor's home.

20.     K.W's car was parked near Taylor's residence at the time the warrant for her home was executed, but because **KYLE MEANY** failed to disclose any information about K.W. or his vehicle, the officers executing the warrant did not know to be on the lookout for K.W.'s car.

21.     According to officers, known to the Grand Jury, who helped execute the Springfield Drive warrant, **KYLE MEANY**'s failure to disclose the information about K.W. increased the danger to both the officers executing the warrant and the people inside Taylor's home because it prevented the executing officers from accurately accounting for the risk of encountering an armed person and adjusting their tactics to reduce the likelihood that they would exchange gunfire.

22.     **JOSHUA JAYNES** and **KYLE MEANY** further heightened the risks associated with the warrant for Taylor's home by failing to consult with LMPD's SWAT unit about the safest tactics and timing for executing it, despite LMPD requirements that they do so.

23.     The SWAT unit had extensive training and experience using specialized equipment and tactics to safely serve high-risk warrants, including certain warrants on residential properties where an occupant might be armed. **JOSHUA JAYNES** and **KYLE MEANY** knew that the non-

SWAT officers chosen to execute the warrant at Taylor's home did not have that specialized training, experience, or equipment. **JOSHUA JAYNES** and **KYLE MEANY** also knew that LMPD policy required non-SWAT officers to consult with the SWAT unit before executing warrants that met a certain risk threshold, and that SWAT was required to execute the highest-risk warrants themselves. To determine whether there was a SWAT consultation requirement and whether SWAT must execute a warrant, LMPD policy required officers to complete a "Risk Assessment Matrix" for each search warrant that assigned numerical values to different risk factors. The initial Risk Matrix that PBI prepared in late January 2020 for the warrant at Taylor's home indicated that SWAT consultation was required.

24.    However, **JOSHUA JAYNES** and **KYLE MEANY** ignored the requirement to consult with SWAT about the tactics and timing for the warrant at Taylor's home and instead planned to execute the warrant on their own, without SWAT's guidance.

25.    **JOSHUA JAYNES** and **KYLE MEANY** hid their plan to execute the warrant for Taylor's home from SWAT during a planning meeting on March 5, 2020. On that day, **JOSHUA JAYNES, KYLE MEANY**, and other PBI detectives met with the SWAT unit to discuss the plan for executing the four Elliott Avenue warrants, as well as other possible warrants that PBI might obtain. During that meeting, **JOSHUA JAYNES** and **KYLE MEANY** did not reveal to SWAT that they were planning to execute the warrant at Taylor's home at the same time that SWAT executed the Elliott Avenue warrants.

26.    At the March 5 planning meeting, SWAT leadership (knowing of the four warrants on or near Elliott Avenue but not knowing of PBI's plan to execute the warrant at Taylor's home) highlighted to **JOSHUA JAYNES** and **KYLE MEANY** the dangers posed by simultaneously

executing warrants in multiple locations. SWAT warned that, when warrants in multiple locations are executed simultaneously, there may be insufficient resources to surround, control, and safely deal with the people who may be inside each of the targeted properties. One SWAT officer known to the Grand Jury told **JOSHUA JAYNES** and **KYLE MEANY** that these resource limitations meant that simultaneous warrant executions could pose a risk to "not just officer safety but the safety of people inside the house that we're going after." To avoid these security risks, SWAT recommended that, on the evening of March 12-13, 2020, warrants should only be executed in one area: the three properties on the same block of Elliott Avenue.

27.    Despite SWAT's warning at the March 5 meeting that officers should not simultaneously execute warrants in multiple locations, **JOSHUA JAYNES** and **KYLE MEANY** continued to plan to execute the warrant at Taylor's home late at night, simultaneously with the Elliott Avenue warrants—and they did not share this plan with SWAT.

28.    **JOSHUA JAYNES** and **KYLE MEANY** continued to plan the late night, simultaneous execution of the warrant at Taylor's home for March 12-13, 2020, despite knowing that doing so carried additional risk because of the limited resources available to execute it safely. Knowing that SWAT had advised against executing warrants in multiple locations simultaneously and knowing that most of the detectives in the PBI unit would be assigned to help SWAT execute the Elliott Avenue warrants, **KYLE MEANY** sent an email to non-SWAT CID officers soliciting volunteers. He then assigned six of these volunteers to execute the warrant at Taylor's home, along with one PBI detective who had not been involved in drafting the affidavit for the warrant at Taylor's home. **JOSHUA JAYNES** and **KYLE MEANY** knew that the seven officers assigned to execute the warrant at Taylor's home had never previously worked together as a group to execute

a warrant, that they lacked the specialized SWAT training, experience, and equipment required to execute a high-risk warrant, and thus they would be less prepared to deal safely with the person with an active CCDW whose car **KYLE MEANY** knew had been present at Taylor's home the day before the warrant was executed.

29.     On the evening of March 12, 2020, **JOSHUA JAYNES** attended and participated in SWAT's pre-warrant briefing for the four Elliott Avenue warrants that SWAT was executing. During that briefing, **JOSHUA JAYNES** again did not disclose to SWAT that PBI was planning to use a group of CID officers to execute the warrant at Taylor's home at the same time that SWAT officers and PBI detectives executed the Elliott Avenue warrants. As a result, SWAT did not account for any possible safety issues with the warrant at Taylor's home in its operational planning.

30.     In addition, **KYLE MEANY** approved a Risk Matrix for the warrant at Taylor's home that ensured that PBI could execute the warrant without SWAT involvement or oversight. As the sergeant in charge of PBI, **KYLE MEANY** was responsible for approving the Risk Matrix for the warrant at Taylor's home. The finalized Risk Matrix for the warrant at Taylor's home that **KYLE MEANY** approved on March 11, 2020, removed a risk factor that had been previously included, which resulted in the warrant no longer meeting the threshold to require consultation with SWAT. In addition, **KYLE MEANY** did not check the box on the Risk Matrix for a no-knock warrant, even though the affidavit for the warrant at Taylor's home requested no-knock authority and the warrant was sworn out as a no-knock warrant. Had **KYLE MEANY** accurately indicated that the Springfield Drive warrant was being sworn out as a no-knock warrant, the resulting Risk Matrix score would have been high enough that SWAT, not the CID officers who **KYLE MEANY** selected, would have been required to execute the warrant.

31.    **JOSHUA JAYNES** and **KYLE MEANY** knew from the March 5, 2020, planning meeting that SWAT would not have been willing to execute the warrant at Taylor's home on the evening of March 12-13, 2020, because of concerns that doing so would stretch LMPD resources and pose safety concerns for officers and the people inside Taylor's home. Had SWAT leadership known about the plan by **JOSHUA JAYNES** and **KYLE MEANY** to execute the warrant at Taylor's home simultaneously with SWAT's execution of the Elliott Avenue warrants, they would have strongly objected, asked **JOSHUA JAYNES** and **KYLE MEANY** for more information about the warrant at Taylor's home, and asked PBI not to simultaneously execute the warrant at Taylor's home. A SWAT officer known to the Grand Jury further stated that if PBI had insisted on executing the warrant at Taylor's home on March 12, SWAT likely would not have been willing to execute the warrants on Elliott Avenue that night.

32.    The final Risk Matrix for the warrant at Taylor's home, which **KYLE MEANY** approved, included a risk factor for the presence of a "handgun" in Taylor's home. However, at the briefing for officers executing the warrant, **KYLE MEANY** did not share this information from the Risk Matrix, and he did not disclose to the officers executing the warrant that he knew that a car belonging to K.W., a man with a prior romantic relationship with Taylor who had an active concealed carry permit, had been at Taylor's home the day before the warrant was executed.

33.    **JOSHUA JAYNES** and **KYLE MEANY** thus knew that officers would execute the warrant at Taylor's home in a manner that would create a dangerous situation both for the officers who carried it out and for anyone who happened to be in Taylor's home, including a risk that the executing officers would exchange gunfire with the man with an active CCDW whose car **KYLE**

**MEANY** knew had been at Taylor's home the previous day, which was the last time officers had conducted surveillance of her apartment before the night of the warrant.

### Officers Used Weapons to Execute the Springfield Drive Warrant and the Warrant Execution Resulted in Taylor's Death

34.    On the evening of March 12-13, 2020, the seven officers assigned by **KYLE MEANY** executed the warrant to search Taylor's home.  None of the officers had reviewed the Risk Matrix for the warrant or had been involved in drafting the search warrant affidavit, and they were unaware that the warrant was based on false and misleading statements and lacked probable cause.  They were also unaware that the car of a man with a permit to carry a concealed weapon had been at Taylor's residence the previous day and that his car was in the parking lot as they approached; thus, they had not accounted for his potential presence in Taylor's home in their planning or execution.

35.    **JOSHUA JAYNES** and **KYLE MEANY** knew that the Springfield Drive warrant would be executed at night, when officers on the execution team would make entry and subject Taylor to the search with their firearms brandished, and when the executing officers would be more likely to surprise unsuspecting residents who may be sleeping inside.  Consistent with this expectation, the officers on the execution team lined up in an entryway near Taylor's door around 12:40 a.m. on March 13, 2020, drew and brandished their weapons, knocked on her door, and demanded entry into her home.

36.    Inside the home, Taylor and K.W. had fallen asleep in Taylor's bedroom watching a movie.  Taylor's bedroom was at the back of the two-bedroom apartment, at the end farthest away from the front door.  Taylor and K.W., like several of her neighbors, did not hear the officers announce themselves as police.  K.W. had a handgun in the bedroom that he kept for protection.

11

37.    Outside the apartment, when no one answered the officers' knocks, an officer with a heavy metal ram broke down the door to the apartment. Several officers with guns drawn stepped forward into Taylor's open doorway as they began to execute the search. The first officer who stepped into the doorway pointed his handgun into Taylor's home.

38.    Moments after the door flew open and the first officer pointed his handgun into Taylor's home, K.W., standing near the entrance to Taylor's bedroom and believing that intruders were breaking in, fired one shot with his handgun, hitting an officer at the front door in the leg. Two LMPD officers immediately responded by firing a total of 22 shots into the apartment. Multiple shots hit Taylor, and one of those shots hit her in the chest.

39.    Taylor died from the gunshot wound to her chest.

Paragraphs 1 through 39 are hereby incorporated by reference into the counts set forth below.

THE GRAND JURY FURTHER CHARGES:

## COUNT ONE
*(Deprivation of Rights Under Color of Law)*

On or about March 12-13, 2020, in the Western District of Kentucky, **JOSHUA JAYNES** and **KYLE MEANY**, while acting under color of law and while aiding and abetting each other and other officers, willfully caused Breonna Taylor to be deprived of the right, secured and protected by the Constitution and laws of the United States, to be free from unreasonable searches and seizures. Specifically, **JOSHUA JAYNES** drafted and swore out a warrant affidavit for Taylor's home, knowing that the warrant would be executed at night by other LMPD officers brandishing firearms, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause.

12

**KYLE MEANY** approved the warrant affidavit for Taylor's home, knowing that the warrant would be executed at night by other LMPD officers brandishing firearms, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause. The offense included the use of a dangerous weapon, to wit, from officers (1) brandishing their weapons to execute the warrant and (2) firing their weapons after officers surprised an armed occupant in the home; and the offense resulted in Taylor's death.

All in violation of Title 18, United States Code, Section 242 and 2(b).

THE GRAND JURY FURTHER CHARGES:

<u>COUNT TWO</u>
(*Conspiracy*)

Beginning not later than in or around April 2020, and continuing until in or around June 2022, in the Western District of Kentucky and elsewhere, **JOSHUA JAYNES** knowingly and willfully conspired and agreed with K.G., and others known and unknown to the grand jury, to commit offenses against the United States; specifically (1) to knowingly falsify a document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation, a federal agency, in violation of 18 U.S.C § 1519; and (2) to knowingly engage in misleading conduct toward another person, with the intent to hinder, delay, and prevent the communication of information to a federal law enforcement officer and judge relating to the commission and possible commission of a federal offense, in violation of 18 U.S.C § 1512(b)(3).

## Manner, Means, and Object of the Conspiracy

1. The object of the conspiracy was to cover up the fact that the Springfield Drive warrant affidavit was false, misleading, stale, and unsupported by probable cause, by (1) submitting a false Investigative Letter and (2) making false statements to criminal investigators.

2. It was part of the manner and means of the conspiracy for **JOSHUA JAYNES** and K.G. to adopt, repeat, and expand upon the Springfield Drive warrant affidavit's false and misleading claims in an official Investigative Letter that they provided to criminal investigators on or about May 1, 2020.

3. It was further part of the manner and means of the conspiracy for **JOSHUA JAYNES** and K.G. to call, text, and meet with each other to discuss the false information in the Springfield Drive warrant affidavit and to coordinate their false cover story in an attempt to escape responsibility for their roles in preparing the warrant affidavit that contained false information.

4. It was further part of the manner and means of the conspiracy for **JOSHUA JAYNES** to contact other officers and pressure them to provide support for the false information in the Springfield Drive warrant affidavit.

5. It was further part of the manner and means of the conspiracy for **JOSHUA JAYNES** and K.G. to make false and misleading statements during interviews with criminal investigators.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objectives, **JOSHUA JAYNES** and his conspirators committed the following overt acts, among others:

14

1. In or around April or May 2020 (after the March 13, 2020, shooting of Breonna Taylor), **JOSHUA JAYNES** called J.M., a fellow LMPD officer, to try to get J.M. to say that he had previously told **JOSHUA JAYNES** that J.G. had received packages at Taylor's apartment. [In fact, J.M. had told **JOSHUA JAYNES** in or around January 2020 that he had no information showing that J.G. received packages at Taylor's apartment, and during the post-shooting call in April or May 2020, J.M. again told **JOSHUA JAYNES** that he was unaware of any information that J.G. had received packages at Taylor's apartment.]

2. After having been told by two officers from the Shively Police Department in April 2020 that J.G. had not received packages at Taylor's home, **JOSHUA JAYNES** wrote in an Investigative Letter that he had "verified through [J.M.] of LMPD, who contacted the postal service, that [J.G.] had been receiving packages at 3003 Springfield Drive #4."

3. In or around April 2020, **JOSHUA JAYNES** and K.G. included in the Investigative Letter the misleading claim that a detective "was able to verify through CLEAR, a law enforcement database, that as of February 20, 2020, [J.G.] used 3003 Springfield Drive #4 as his residence." **JOSHUA JAYNES** and K.G. both knew at the time that this statement was misleading because, as they knew, J.G. did not live at 3003 Springfield Drive in February 2020.

4. From on or about April 11, 2020, through on or about May 1, 2020, K.G. reviewed a draft of the Investigative Letter, sent to her by **JOSHUA JAYNES**, containing the claim that J.M. had verified that J.G. had received packages at Taylor's address. Knowing that the statement was false, K.G. failed to change the statement or object to it. K.G. later signed the letter, which included this false statement.

5. On or about May 1, 2020, **JOSHUA JAYNES** and K.G. signed and submitted the Investigative Letter that they had jointly drafted about PBI's investigation that led to the search warrants that were served on March 13, 2020.  At the time, **JOSHUA JAYNES** and K.G. knew that the letter contained false and misleading information that purported to link Breonna Taylor to J.G., and that the letter omitted information that would have undermined the claim of an ongoing connection between Taylor and J.G.

6. On or about May 17, 2020—after media outlets reported that a Postal Inspector had announced that J.G. had *not* received packages at Taylor's address as alleged in the Springfield Drive warrant affidavit and the May 1, 2020, Investigative Letter—**JOSHUA JAYNES** texted K.G. that a criminal investigator wanted to meet with him the following day and arranged to meet with K.G. in **JOSHUA JAYNES'S** garage that night.

7. When **JOSHUA JAYNES** and K.G. met in the garage on the evening of May 17, 2020, **JOSHUA JAYNES** relayed to K.G. that they needed to get on the same page because they could both go down for putting false information in the Springfield Drive warrant affidavit.

8. During the meeting in the garage, **JOSHUA JAYNES** and K.G. agreed to tell investigators a false story, claiming that J.M. had told them in January 2020 that J.G. was receiving packages at Taylor's home.

9. On or about May 19, 2020, two days after the garage meeting, **JOSHUA JAYNES** falsely claimed to investigators with LMPD's Public Integrity Unit that, in January 2020, J.M. had told him and K.G. "nonchalantly" that "your guy [J.G.] just gets Amazon or mail packages there [at Taylor's home]."

16

10. On or about August 12, 2020, K.G. falsely told investigators with the Kentucky Office of the Attorney General that, in January 2020, "[J.M.] in passing" had told K.G. and **JOSHUA JAYNES** that he "verified [J.G.] was getting packages there [at Taylor's home]."

11. On or about June 14, 2022, during an interview with agents with the Federal Bureau of Investigation, **JOSHUA JAYNES** falsely claimed that, in January 2020, J.M. "made a nonchalant comment" that J.G. was getting "mail or Amazon packages" at Taylor's home.

All in violation of Title 18, United States Code, Section 371.

THE GRAND JURY FURTHER CHARGES:

## COUNT THREE
### (*Falsification of Records in a Federal Investigation*)

On or about May 1, 2020, in the Western District of Kentucky, **JOSHUA JAYNES**, acting in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, knowingly falsified a document with the intent to impede, obstruct, and influence the investigation and proper administration of that matter. Specifically, **JOSHUA JAYNES** falsified an Investigative Letter, which he knew would be used in a criminal investigation into the preparation and execution of the Springfield Drive warrant at Breonna Taylor's home, by including false and misleading statements about the connection between Taylor and alleged drug trafficking, and by omitting material information that undermined the claim of an ongoing connection.

All in violation of Title 18, United States Code, Section 1519.

THE GRAND JURY FURTHER CHARGES:

## COUNT FOUR
*(False Statement to Federal Investigators)*

On or about May 17, 2022, in the Western District of Kentucky, **KYLE MEANY** knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the executive branch of the Government of the United States. Specifically, **KYLE MEANY** falsely told an agent with the Federal Bureau of Investigation that a paragraph requesting authority to make a no-knock entry at Taylor's home was included in the Springfield Drive warrant affidavit because officers on LMPD's SWAT unit had, during a planning meeting on or about March 5, 2020, asked for no-knock authority at that location. In truth and in fact, **KYLE MEANY** knew that SWAT did not ask PBI to request a no-knock entry at 3003 Springfield Drive, Apartment 4.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL:

**Redacted**

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

MICHAEL J. SONGER
SPECIAL LITIGATION COUNSEL

ANNA GOTFRYD
TRIAL ATTORNEY

ATTORNEYS FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED BY 28 U.S.C. § 515

UNITED STATES OF AMERICA v. JOSHUA JAYNES

**PENALTIES**

| | |
|---|---|
| Count 1: | NM Life/$250,000/both/NM 5 yrs. Supervised Release |
| Count 2: | NM 5 yrs./$250,000/both/NM 3 yrs. Supervised Release |
| Count 3: | NM 20 yrs./$250,000/both/NM 3 yrs. Supervised Release |

**NOTICE**

**ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL ASSESSMENTS, FINES, RESTITUTION & COSTS.**

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after November 11, 1984, as follows:

| Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
|---|---|---|---|
| | $125 per count/other | | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due immediately unless the court issues an order requiring payment by a date certain or sets out an installment schedule. You shall provide the United States Attorney's Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of court. 18 U.S.C. § 3571, 3572, 3611, 3612

**Failure to pay fine as ordered may subject you to the following:**

1. **INTEREST** and **PENALTIES** as applicable by law according to last date of offense.

   For offenses occurring after December 12, 1987:

   No **INTEREST** will accrue on fines under $2,500.00.

   **INTEREST** will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at the time of sentencing. This rate changes monthly. Interest accrues from the first business day following the two week period after the date a fine is imposed.

   **PENALTIES** of:

   10% of fine balance if payment more than 30 days late.

   15% of fine balance if payment more than 90 days late.

2. Recordation of a **LIEN** shall have the same force and effect as a tax lien.

3. Continuous **GARNISHMENT** may apply until your fine is paid.

18 U.S.C. §§ 3612, 3613

   If you **WILLFULLY** refuse to pay your fine, you shall be subject to an **ADDITIONAL FINE** of not more than the greater of $10,000 or twice the unpaid balance of the fine; or **IMPRISONMENT** for not more than 1 year or both. 18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law.  18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

1.    That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

2.    Give bond for payment thereof.

18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

LOUISVILLE:        Clerk, U.S. District Court
                   106 Gene Snyder U.S. Courthouse
                   601 West Broadway
                   Louisville, KY  40202
                   502/625-3500

BOWLING GREEN:     Clerk, U.S. District Court
                   120 Federal Building
                   241 East Main Street
                   Bowling Green, KY  42101
                   270/393-2500

OWENSBORO:         Clerk, U.S. District Court
                   126 Federal Building
                   423 Frederica
                   Owensboro, KY  42301
                   270/689-4400

PADUCAH:           Clerk, U.S. District Court
                   127 Federal Building
                   501 Broadway
                   Paducah, KY  42001
                   270/415-6400

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.

UNITED STATES OF AMERICA v. KYLE MEANY

### PENALTIES

Count 1:      NM Life/$250,000/both/NM 5 yrs. Supervised Release
Count 4:      NM 5 yrs./$250,000/both/NM 3 yrs. Supervised Release

### NOTICE

**ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL ASSESSMENTS, FINES, RESTITUTION & COSTS.**

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after November 11, 1984, as follows:

| Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
| | $125 per count/other | | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due immediately unless the court issues an order requiring payment by a date certain or sets out an installment schedule. You shall provide the United States Attorney's Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of court. 18 U.S.C. § 3571, 3572, 3611, 3612

**Failure to pay fine as ordered may subject you to the following**:

1.    **INTEREST** and **PENALTIES** as applicable by law according to last date of offense.

   For offenses occurring after December 12, 1987:

   No **INTEREST** will accrue on fines under $2,500.00.

   **INTEREST** will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at the time of sentencing. This rate changes monthly. Interest accrues from the first business day following the two week period after the date a fine is imposed.

   **PENALTIES** of:

   10% of fine balance if payment more than 30 days late.

   15% of fine balance if payment more than 90 days late.

2.    Recordation of a **LIEN** shall have the same force and effect as a tax lien.

3.    Continuous **GARNISHMENT** may apply until your fine is paid.

18 U.S.C. §§ 3612, 3613

   If you **WILLFULLY** refuse to pay your fine, you shall be subject to an **ADDITIONAL FINE** of not more than the greater of $10,000 or twice the unpaid balance of the fine; or **IMPRISONMENT** for not more than 1 year or both. 18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law.  18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

1.      That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

2.      Give bond for payment thereof.

18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

|  |  |
| --- | --- |
| LOUISVILLE: | Clerk, U.S. District Court |
|  | 106 Gene Snyder U.S. Courthouse |
|  | 601 West Broadway |
|  | Louisville, KY  40202 |
|  | 502/625-3500 |
|  |  |
| BOWLING GREEN: | Clerk, U.S. District Court |
|  | 120 Federal Building |
|  | 241 East Main Street |
|  | Bowling Green, KY  42101 |
|  | 270/393-2500 |
|  |  |
| OWENSBORO: | Clerk, U.S. District Court |
|  | 126 Federal Building |
|  | 423 Frederica |
|  | Owensboro, KY  42301 |
|  | 270/689-4400 |
|  |  |
| PADUCAH: | Clerk, U.S. District Court |
|  | 127 Federal Building |
|  | 501 Broadway |
|  | Paducah, KY  42001 |
|  | 270/415-6400 |

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.